UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICKEY RITCHIE, | ) | Case No. 1:07 CV 958 |
| | ) | |
| Plaintiff, | ) | Judge Kathleen M. O'Malley |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Rickey Ritchie appeals under 42 U.S.C. §405(g) and §1383(c)(3) from the administrative denial of disability insurance benefits and supplemental security income claiming that the denial is not supported by substantial evidence. At issue is the administrative decision dated July 18, 2006 from an administrative law judge (ALJ). Ritchie claimed that he was disabled since February 23, 2001 (the date he was "fired because I turned down a load of freight" (Tr. 88)) at a time when he was 44 years of age. Ritchie complains of stroke residuals such as left-sided weakness, heart attack, and neck pain. He also walks with the assistance of two crutches. After reviewing the evidence the ALJ determined that Ritchie suffered from severe impairment due to depression, history of alcohol abuse and conversion disorder, but he nonetheless could perform medium exertion limited to simple, repetitive tasks. Based on this residual functional capacity Ritchie could no longer perform his past relevant work as a commercial truck driver, shift supervisor, seal crew worker and splicer. (Tr.36). Based on the medical-vocational guidelines of Appendix 2 and vocational expert testimony, the ALJ found Ritchie was not disabled. In making this decision the ALJ was assisted by a medical expert Dr. Madden (Tr. 575-94, 600-08), and vocational expert, Mr. Walker (Tr. 542-47). This decision

1:07 CV 958                                                2

became the final decision of the Commissioner following the Appeals Council's denial of review. See 20 C.F.R. §404.981, §416.1481.

The primary challenge to the administrative denial of benefits is Ritchie's claim of error in analyzing the evidence of his somatoform disorder, and secondarily rejecting the opinion from Dr. Vore, a treating physician and other evidence of allegedly disabling mental impairment. The issues before this court must be resolved under the standard whether there is substantial evidence in the record to support the Commissioner's decision. Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantiality is based upon the record taken as a whole. *Barney v. Secretary of Health and Human Services*, 743 F.2d 448 (6th Cir. 1984); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984). Substantial evidence is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Smith v. Secretary*, 893 F.2d 106, 108 (6th Cir. 1989); *Richardson*, 402 U.S. at 401.

> In determining whether the Secretary's factual findings are supported by substantial evidence, we must examine the evidence in the record `taken as a whole.' *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980), and "must take into account whatever in the record fairly detracts from its weight." *Beavers v. Secretary of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951)). If it is supported by substantial evidence, the Secretary's determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam).

1:07 CV 958                                            3

*Wyatt v. Secretary*, 974 F.2d 680, 683 (6th Cir. 1992); *Born v. Secretary*, 923 F.2d 1168, 1173 (6th Cir. 1990); and see *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (court may "not inquire whether the record could support a decision the other way").

*The ALJ's analysis of a somatoform disorder was not erroneous*:

Ritchie was found to contemporaneously suffer from severe mental impairments of depression and conversion disorder. His treating physician, Dr. Vore, diagnosed somatoform disorder and opined that Ritchie would likely miss work four or more times monthly (Tr. 277, 468-69, 507-08). Although Dr. Vore spoke of somatic complaints and the ALJ found conversion disorder, Ritchie understands that both are addressing the same physical manifestations of a mental impairment. See *Blankenship v. Bowen*, 874 F.2d 1116, 1118 n.3, 1123 n.10 (6th Cir. 1989)("[conversion disorder] is a type of somatoform disorder. With these disorders,'attempts to alleviate anxiety give rise to symptoms of physical disorder, but with no demonstrable organic disorders.(citation omitted)"); and see American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* §300.11 "Conversion Disorder" (Fourth ed. Rev., 2000)("DSM-IV-TR"). However, a diagnosis does not equate with disability.

Ritchie naturally agrees that these are severe impairments for purposes of the first step in the sequential evaluation process, but in a note Ritchie argues that there is inconsistency between Dr. Madden's testimony that Ritchie had three episodes of decompensation, whereas the ALJ found

1:07 CV 958                                          4

none (Tr. 29, 603). [1] It appears that Ritchie is challenging the finding at the third step of sequential evaluation that his impairments do not meet or medically equal an impairment listed in Appendix 1 of Subpart P (Tr. 37).

Since Ritchie's impairments are mental impairments categorized under §12.00 of the Listing of Impairments, the sequential evaluation must be applied in conjunction with §404.1520a governing mental impairment and its SSI counterpart §416.920a. This requires rating the degree of functional limitation in accordance with the prescribed psychiatric review technique (PRT). The primary purpose of the PRT is to assess whether or not a claimant's mental restrictions meet or equal the listing of impairments. 20 C.F.R. §404.1520a(c)(3) and §416.920a(c)(3) incorporate assessment of severity as described under §12.00C of the Listing of Impairments of Appendix 1. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00C. The procedure is to rate "four broad functional areas" of activities of daily living, social functioning, concentration, persistence and pace, and episodes of decompensation. See 20 C.F.R. §404.1520a(c)(3); §416.920a(c)(3). The first three functional areas

---

[1] Pursuant to 20 C.F.R. §404.1520(a) there is a five-step sequential evaluation process beginning with the question whether the applicant is engaged in substantial gainful activity and then at the second step whether there is a medically severe impairment. See §404.1520(a)(4)(i) and (ii) and §416.920(a)(4)(i) & (ii). At the third step of a disability evaluation sequence which is critical here, which is whether the claimant has an impairment which meets or equals a listed impairment from the Listing of Impairments of Appendix 1. See 20 C.F.R. §404.1520(a)(iii) and (d); §416.920(a)(iii) and (d). If an impairment exists which meets the description from the listing or is its equivalent, the claimant is deemed disabled at that point without consideration of age, education or prior work experience. See *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (Once a claimant has met this burden that ". . . his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without determination whether he can perform his prior work or other work."). At the fourth step, the ALJ must formulate the claimant's residual functional capacity and if at this step the claimant can perform past relevant work. Once an ALJ determines that an individual cannot perform past relevant work, then the burden of going forward shifts to the Commissioner at the fifth step to demonstrate the existence of types of employment compatible with the individual's disability. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Ellis v. Schweiker*, 739 F.2d 245 (6th Cir. 1984); *Cole v. Secretary*, 820 F.2d 768, 771 (6th Cir. 1987); *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

1:07 CV 958                                                5

are rated on the five point scale of "none," "mild," "moderate," "marked," and "extreme." See §404.1520a(c)(4); §416.920a(c)(4). The last area, deterioration or decompensation is rated on the four-point scale of "none," "one or two," or "three, four or more." *Id.*

Sections 404.1520a(c)(4) and 416.920a(c)(4) instruct that ratings of none or mild in the first three functional areas and none in the last functional area indicate non-severe impairment. In all other instances, the ALJ must assess whether a "severe" mental impairment meets or equals a listed impairment, and then, if not, assess residual functional capacity and the ability to perform substantial gainful activity. See §404.1520a(d)(2)&(3); §416.920a(d)(2)&(3).

The listings at issue is §12.04 governing affective disorders, in this case depression and §12.07, governing somatoform disorders. See 20 "C.F.R. Pt. 404, Subpt. P, App 1. Both listings require ratings totaling two or more of marked restriction in the first three areas or repeated episodes of decompensation in the fourth area. *Id.*, §12.04(B) and §12.07(B). The ALJ found less than "marked" restriction in the first three areas, and Ritchie does not argue that these conclusions were erroneous. Consequently, the ALJ's error in failing to identify the presence of one of these four areas under the PRT, in this case repeated episode of decompensation, fails to establish that Ritchie's degree of mental impairment met the severity required under these listings.[2] In effect, the ALJ's error at the third step of the sequential evaluation process was harmless.

---

[2] Alternatively §12.04 contains "C criteria" but Ritchie does not argue that the evidence supports any of these criteria.

1:07 CV 958 6

Ritchie next contends that the ALJ's finding concerning his residual functional capacity at the fourth step of sequential evaluation is erroneous. It is Ritchie's burden to establish a condition of disabling severity, which he has not done due to evidence of malingering.

One of the diagnostic criteria for conversion disorder is that "it is not intentionally produced or feigned (as in Factitious disorder or Malingering)." DSM-IV-TR pg. 498. Even Ritchie's treating physician, Dr. Vore, expressed his concern over possible malingering (Tr. 33-34).

Ritchie refers the court to Dr. Vore's statements: "This is the remains of what may have been a stroke several years ago, may have been malingering. I don't believe he just falls, though, on the malingering basis. He has nothing to gain" (Tr. 263); and "It's possible that he was malingering in which case it's the opposite of the expected mechanics of the neck. Nevertheless, I don't think he consciously malingers although he certainly feels sorry for himself" (Tr. 445). Ritchie maintains that Dr. Vore was distinguishing Ritchie's impairment from malingering. Contrary to Dr. Vore's first statement, Ritchie had much to gain with false statements of continued residuals from a prior stroke, etc., (which no examination or medical study could confirm). His goal is to obtain government benefits.

On the issue of conscious malingering, Dr. Madden testified at the second hearing about his concern over a "factitious component" (Tr. 585). At the third hearing, this medical advisor explained that the record demonstrated malingering, and concluded that based on the record the supportable diagnosis was depressive disorder, not otherwise specified (Tr. 601-02). Thus, in his

1:07 CV 958                                                                 7

view the evidence of malingering demonstrated conscious action which negated a diagnostic criteria of conversion disorder.

The ALJ's decision appears to be a compromise. The ALJ accepted both the diagnosis of conversion disorder and found malingering (Tr. 33-35, 37). It is perhaps, as Ritchie argues, a failure to properly analyze the evidence of somatoform disorder, but if anything, the ALJ's error favored Ritchie. Ritchie attempts to use this misapprehension and inconsistency to steer the court toward reversal claiming disabling conversion disorder. Ritchie questions whether Dr. Madden understood the concept of a somatoform or conversion disorder and whether he was qualified to testify on his impairments which consist of both physical or mental components. (Brief at 8). Dr. Madden, though, was not the source for inconsistency in the decision.

Ritchie also contends that since several medical sources have opined or suggested that he suffers some type of somatoform disorder, the ALJ should not have discredited his testimony and complaints of disabling mental illness. (Brief at 10). However, each of these opinions was based on each discrete mental status examination. Those examiners did not have the advantage of an overview to compare results and observe inconsistencies, as did Dr. Madden and the ALJ. Ritchie further quibbles with several of the ALJ's examples of inconsistency used to support the conclusion of malingering. Even so, the ALJ had substantial evidence of exaggeration for concluding that Ritchie was a malingerer. Ritchie concedes that generally deference is afforded the credibility determination of the ALJ. See *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)( a case involving diagnosed conversion disorder); *Rogers v. Comm'r of Soc.Sec*. 486 F.3d 234, 247 (6th

1:07 CV 958                                                                 8

Cir. 2007); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). There is no reason to depart from this general rule. The ALJ noted that Dr. Konieczny;'s mental status examinations indicated borderline intellectual functioning, in contrast to Dr. Sunbury's findings of low average functioning and Dr. Ickes May 2001 finding of average intellectual functioning (Tr. 28, 229, 437, 500). The ALJ noted that the validity of psychological testing had been questioned, that Ritchie reportedly had been making inconsistent effort, and the low I.Q. scores conflicted with Ritchie's past relevant work as a shift supervisor, truck driver and machine printer (Tr. 28). The ALJ also noted Dr. Vore's concern over malingering (as discussed above), Dr. Vore's concern over the multitude of mood altering medications Ritchie was taking (Tr. 34), Dr. Vore's note that Ritchie was playing football with his grandson (*Id.*), and the inconsistent versions of his symptoms given to the examiners. (*Id.*). Ritchie cannot deny this evidence. Further, state agency reviewing psychologists opined that Ritchie could "handle the demands of simple, repetitive work" (Tr. 240, 256).

In keeping with the spirit of the ALJ's decision, there apparently was some degree of an involuntary component to Ritchie's mental impairment that the ALJ accepted in finding conversion disorder in addition to depression. The ALJ found that Ritchie physically could perform medium level exertion ( See 20 C.F.R.§ §404.1567(c), 416.967(c)) limited to unskilled work and restricted to simple, repetitive tasks (Tr. 37). Aside from his challenge's to Dr. Madden's testimony and the ALJ's findings regarding malingering, Ritchie does not contest any other feature of the ALJ's findings at the fifth step of the sequential evaluation. Since the ALJ had substantial evidence to support his conclusions on the severity of Ritchie's impairments, no error of consequence has been demonstrated.

1:07 CV 958                                                                                       9

*ALJ's rejection of the opinion from the treating physician:*

This leads to the issue of the ALJ's rejection of Dr. Vore's residual functional capacity. In August 2002 Dr. Vore opined that Ritchie could lift and carry 20 lbs. frequently and 50 lbs. occasionally, sit for two hour intervals, stand for 30 minute intervals, walk two to three blocks, need unscheduled breaks, never climb ladders, crouch and climb stairs occasionally, and be absent from work more than four days per month (Tr. 273-278). Dr. Vore also completed a Stroke Residual Functioning Capability Assessment and questioned whether Ritchie actually suffered a stroke (Tr. 279). He responded that Ritchie "possibly" might be a malingerer (Tr. 280). The doctor also responded that Ritchie's symptoms would frequently interfere with attention and concentration. Dr. Vore again opined that Ritchie could stand/walk about four hours, sit at least six hours, and (Tr. 281), and occasionally lift 50 pounds and 20 pounds frequently (Tr. 282). He also opined that Ritchie was capable of low stress jobs (Tr. 283). In addition, Dr. Vore opined that Ritchie would miss more than four days of work per month (Tr. 283). On November 4, 2002, Dr. Vore wrote a letter to the Government Assistance Program indicating that Ritchie was "not capable of working at this time and is effectively disabled" and that it was "appropriate for him to continue with some assistance with his utility bills...." (Tr. 287).

The ALJ rejected Dr. Vore's opinions as inconsistent with the totality of the objective medical evidence of record, based on subjective complaints from the patient, and as outside the doctor's area of expertise (Tr. 30). He then went on to address the "reality" that the doctor wrote these opinions to satisfy his patient's requests to avoid doctor-patient tension (Tr. 30-31).

1:07 CV 958                                            10

As *Wilson v. Commissioner* instructs, the ALJ must give the opinion from the treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  *Id.*, 378 F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. §404.1527(d)(2) and §416.927(d)(2). Supportability is fairly obvious to determine if it is based on the laboratory findings and medical signs. Consistency is simply consistency "with the record as a whole." Supportability of the medical opinion of disability has long been a key factor in determining how much weight to give the opinion.  The ALJ is not bound by a conclusory opinion which is unsupported by detailed objective criteria, or when there is substantial medical evidence to the contrary. *Cutlip v. Secretary*, 25 F.3d 284, 286 (6th Cir. 1994); *Cohen v. Secretary*, 964 F.2d 524, 528 (6th Cir. 1992); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). This has been incorporated into the regulatory scheme under §404.1527(d)(2) and its SSI counterpart §416.927(d)(2), which require that the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques." This includes reporting : (1) treatment provided; (2) extent of examination; and (3) testing (20 C.F.R. §404.1527(d)(2)(ii) and §416.927(d)(2)(ii)). The ALJ *must* apply the regulatory factors of this section when explaining why the treating source was not accorded controlling weight. *Bowen v. Commissioner of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007), citing *Wilson*, 378 F.3d at 544. The ALJ also must consider the medical opinions "together with the rest of the relevant evidence." See 20 C.F.R. §416.927(b).

The ALJ noted that Dr. Vore was a general practitioner and lacked expertise. The governing regulations recognize that specialists are accorded more weight, so this reason is valid. See 20

1:07 CV 958                                                                  11

C.F.R. §§404.1527(d)(5) and 416.927(d)(5). This ties in with the ALJ's acceptance of Dr. Patel's findings as the treating psychiatrist and the rejection of the findings of consultative psychologists. Dr. Patel rated Ritchie as having a GAF score of 55, and later reported that Ritchie was "asymptomatic" (Tr. 23, 31, 460, 465). A GAF score of 55 places Ritchie's degree of impairment in the middle of the moderate range. See DSM-IV-TR pg. 34. The ALJ also based rejection on supportability due to a lack of medically acceptable clinical and laboratory diagnostic techniques in regard to Dr. Vore's opinions and reliance on subjective complaints in regard to the consultative psychologists, and inconsistency with the evidence of record . (Tr. 30-31).

Granted the ALJ continued on with his speculation that Dr. Vore was coerced into opining Ritchie was disabled, and this clearly was both lacking support from the record and not one of the factors under the regulations governing evaluation of treating physicians opinions. However, the ALJ utilized the legitimate factors of consistency, supportability and specialization to reject Dr. Vore's opinions of disability, the ALJ's findings were supported by substantial evidence, and consequently the ALJ's speculations can be treated as harmless surplusage.

### *CONCLUSION AND RECOMMENDATION*

In view of the record and arguments presented in the statement of errors and subsequent briefing and considering the applicable law yields the conclusion that the Commissioner's decision denying disability insurance benefits and supplemental security income was supported by substantial evidence and should be affirmed.

                                                          s/James S. Gallas

1:07 CV 958                                                                 12

                                                            United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).


Dated: August 15, 2008