## THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **RICKEY RITCHIE**, | ) | **Case No.: 1:07CV0958** |
| | ) | |
| | ) | **JUDGE KATHLEEN O'MALLEY** |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE JUDGE** |
| **v.** | ) | **JAMES GALLAS** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | **OPINION** |
| | ) | |
| **Defendant.** | ) | |

Plaintiff Rickey Ritchie seeks judicial review of the Administrative Law Judge's ("ALJ") denial of his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). Pursuant to Local Rule 72.2(b), this matter was referred to Magistrate Judge James S. Gallas for the preparation of a Report and Recommendation ("R&R"). The Magistrate's R&R was issued on August 15, 2008, recommending that the ALJ's decision be affirmed. Plaintiff has filed timely written objections to the Magistrate Judge's R&R. For the reasons articulated below, the Court hereby **ADOPTS** the R&R, **AFFIRMS** the ALJ's decision, and **DISMISSES** this case.

## I.     BACKGROUND

### A.     Statement of the Case

On March 9, 2001, Plaintiff filed his application for disability benefits (Tr.76), alleging disability since February 23, 2001(Tr. 290). Plaintiff claimed that his ability to work was limited by emotional problems, effects of a stroke, and severe depression (Tr. 88). The Social Security

Administration ("SSA") denied Plaintiff's disability applications initially (Tr. 60, 62-65, 293-97) and upon reconsideration (Tr. 61, 67-70, 299-303).

Thereafter, Plaintiff requested an appeal of the SSA's decision by an ALJ (Tr. 71). On August 25, 2003, Plaintiff and his attorney, Andrew C. Haag, appeared before ALJ William L. Hafer (Tr. 516-49). In a decision dated December 2, 2003, the ALJ denied Plaintiff's application for disability benefits (Tr. 307-18). The ALJ found that Plaintiff could not perform his relevant past work as a commercial truck driver, shift supervisor, seal crew worker and splicer, but decided that he could make an adjustment to other work which existed in significant numbers in the national economy (Tr. 308). Specifically, the ALJ found that Ritchie could perform work requiring medium exertion, limited to simple, repetitive tasks. Therefore, after considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that Plaintiff did not have a disability as that term is defined in the Social Security Act (Tr. 308).

Plaintiff sought review of the ALJ's decision by the Appeals Council (Tr. 319-20). On March 20, 2004, the Appeals Council issued a Remand Order (Tr. 321-24). Upon reconsideration, ALJ Hafer denied Plaintiff's application for disability benefits, again concluding that Plaintiff could perform work requiring medium exertion, limited to simple, repetitive tasks, and that he remained capable of performing a significant number of jobs existing in the economy (Tr. 18-38). Thereafter, Plaintiff requested another review of the ALJ's decision by the Appeals Council (Tr. 12-14). The Appeals Council denied Plaintiff's second request for review on March 19, 2007, thus making the ALJ's second decision the final decision of the Commissioner (Tr. 9-11).

Plaintiff has now filed a complaint in this Court, requesting that the ALJ's decision be reversed or (in the alternative) remanded. Plaintiff generally contends that the ALJ's decision was not supported by substantial evidence. More specifically, Plaintiff challenges the ALJ's analysis

of somatoform disorder, as well as the decision to reject certain opinions of Plaintiff's treating physician.

### B.    Statement of the Relevant Facts

Plaintiff claims that stroke residuals and emotional problems render him disabled (Tr. 88). On September 3, 1996, Ashland Samaritan Hospital admitted Plaintiff after his left leg collapsed and he was unable to bear weight (Tr. 135-36).  Plaintiff also complained of tingling in his hands and pain going up his arm and into his neck (Tr. 135).  Plaintiff informed the admitting nurse that he had been drinking heavily at a picnic the previous day when his leg collapsed (Tr. 135).  Upon admission, Plaintiff had a blood alcohol level of 0.189 (Tr. 135, 138, 140, 159, 161).  Plaintiff did not admit to having a drinking problem, but informed hospital personnel that he drank to cope with anxiety (Tr. 135).[1]  The admission diagnosis provided that Plaintiff had left-sided weakness and alcohol intoxication (Tr. 135).  The hospital admitted Plaintiff for physical therapy and observation (Tr. 135).

While at Samaritan Hospital, Plaintiff underwent an MRI scanning of his brain and spinal cord, as well a CAT scan (Tr. 136, 138, 140, 142, 158).  Plaintiff received unremarkable results on these tests (Tr. 138).  Furthermore, Plaintiff's chest x-rays showed no acute disease (Tr. 156) and x-rays of his cervical spine showed no fracture or dislocation or evidence of acute disease (Tr. 157). The Plaintiff's neurological examination revealed no evidence of central nervous system disease (Tr. 139).  The neurologist concluded that Plaintiff was probably having a conversion reaction (Tr. 135, 138) and that his symptoms were only temporary (Tr. 139).  Notably, the neurologist found that Plaintiff "never personally had [a] heart attack [or] stroke" (Tr. 138).  On September 6, 1996, Samaritan Hospital discharged Plaintiff (Tr. 136).

---

[1] Plaintiff also expressed that he had financial problems and that he made only $7.30 per hour (Tr. 135).

On August 29, 1999, the claimant presented to Ashland Samaritan Hospital Emergency Room threatening suicide (Tr. 183). Upon admission, Plaintiff had a blood alcohol level of .2069 and he admitted to drinking approximately a 12-pack of beer per day (Tr. 185). Plaintiff's mental status examination was normal, but his mood was flat and depressed (Tr. 186). Plaintiff's physical examination was normal (Tr. 194).

Plaintiff alleges that he suffered a heart attack in November of 2000 (Tr. 227). On November 7, 2000, Akron General Medical Center admitted Plaintiff for chest pain (Tr. 200). While at Akron General, Plaintiff was given a thorough cardiac evaluation (Tr. 203). Plaintiff's EKG revealed no acute ischemic changes (Tr. 203). Furthermore, Plaintiff had normal sinus rhythm and his chest x-rays did not indicate acute infiltrate or disease (Tr. 203, 207). Plaintiff's electrolytes were within normal limits (Tr. 203). Evaluation of the pulmonary arteries showed no evidence of filling defects (Tr. 218). Finally, a left heart catheterization and coronary angiography revealed only mild luminal atheromatous disease with mitral value prolapse and mild concentric left ventricular hypertrophy (Tr. 206). Furthermore, Akron General found no significant obstructive coronary disease (Tr. 206). The discharging physician informed Plaintiff on his Home Instructions Discharge Summary sheet that he could resume regular physical activity (Tr. 201).

On December 15, 2000, Dr. Vore examined Plaintiff to follow-up with his chest pain (Tr. 270). Dr. Vore noted that Plaintiff returned to work on November 20, 2000 and that he worked 73 hours the previous week (Tr. 270). Dr. Vore reported that Plaintiff was discouraged because he worked long hours, but was unable to get ahead financially and did not have any opportunities to "have fun" (Tr. 270). Dr. Vore also emphasized that Plaintiff expressed frustration with his wife's insistence that he stop drinking beer (Tr. 270). Furthermore, Plaintiff complained that he was having trouble sleeping at night (Tr. 270). Dr. Vore prescribed a low-dose of trazodone to help Plaintiff

4

sleep and to help with his "outlook," and he increased the dosage of his chest pain medication (Lopressor) (Tr. 270).

On February 28, 2001, Plaintiff visited Dr. Vore, because he felt discouraged (Tr. 269). Plaintiff informed Dr. Vore that he had been fired from his job five days earlier and that if he had a gun that he would shoot himself (Tr. 269).  Plaintiff asked Dr. Vore about applying for disability and complained that he had never been able to hold a job for very long (Tr. 269).  Plaintiff inquired as to whether there was a way to get disability benefits because of the fact that he could not maintain consistent employment (Tr. 269).  Dr. Vore concluded that Plaintiff was somewhat depressed and that he had a dysthymic personality disorder (Tr. 269).  Dr. Vore prescribed various medications and suggested that Plaintiff undergo a psychological evaluation (Tr. 269).

Dr. Vore examined Plaintiff on April 26, 2001 and found that "physically he ha[d]n't been doing badly" (Tr. 268).  Dr. Vore opined that if Plaintiff got psychological help and possibly job retraining, then he would be employable (Tr. 268).  Dr. Vore noted that Plaintiff objected to most of his treatment suggestions (Tr. 268).  Dr. Vore re-prescribed some of Plaintiff's mood altering medications and prescribed Ambien to alleviate Plaintiff's sleeplessness (Tr. 268).

On May 17, 2001, Curt S. Ickes, Ph.D., conducted a psychological evaluation of Plaintiff at the request of the State Agency (Tr. 228).  In his mental status evaluation, Dr. Ickes noted that Plaintiff arrived promptly, had an overall neat appearance, and acted alert and oriented (Tr. 228). Furthermore, Dr. Ickes stated that Plaintiff had a normal posture and used no physical device or aids except for glasses (Tr. 228).  Dr. Ickes also indicated that Plaintiff drove himself to the appointment (Tr. 228).  Dr. Ickes reported that there were no deficits in Plaintiff's speech or hearing and that his mental capacity was reality based without evidence of hallucinations or delusions (Tr. 228).  The doctor concluded that Plaintiff's memory was fair and that his general fund of knowledge was

5

excellent (Tr. 228).  While Dr. Ickes determined that Plaintiff's ability to execute simple repetitive tasks in a competitive work environment would be mildly to moderately limited due to his level of depression (Tr. 228), he found that Plaintiff's social reasoning was excellent (Tr. 229).  Furthermore, Dr. Ickes emphasized that Plaintiff's vocabulary was in the average range, and that his overall intellectual functioning was within the average range classification (Tr. 228).  Dr. Ickes assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 60 (Tr. 229). [2]

On June 29, 2001, Dr. Sushil M. Sethi provided Plaintiff with a physical examination at the request of the State Agency (Tr. 230).  Dr. Sethi determined that Plaintiff had a normal grasp, manipulation, pinch, and fine coordination (Tr. 234).  Dr. Sethi also found that Plaintiff did not suffer from muscle spasms or muscle atrophy (Tr. 234).  Furthermore, Dr. Sethi determined that Plaintiff had a normal range of motion in his spine, shoulder, elbow, wrist, fingers, and hands (Tr. 235).  As such, Dr. Sethi concluded that Plaintiff had the ability to do work-related physical activities such as sitting, standing, walking, carrying/handling objects, hearing, speaking, and traveling (Tr. 232).  Furthermore, Dr. Sethi determined that there was no evidence that Plaintiff had any obvious mental impairment (Tr. 232).

On August 23, 2001, Dr. Robelyn S. Marlow, Ph.D., a State Agency psychologist, conducted a review of the evidence of record and concluded not only that Plaintiff's memory appeared to be intact, but also that Plaintiff could handle the demands of simple, repetitive work (Tr. 256).  Thereafter, Caroline T. Lewin, Ph.D., also a State Agency psychologist, reviewed the evidence of record and concurred with Dr. Marlow's assessment (Tr. 240, 256).

---

[2]  The GAF scale is used to report the clinician's judgment of an individual's overall level of functioning.  A GAF scale of 51-60 indicates moderate symptoms such as flat affect or suggests moderate difficulty in social occupational, or school functioning.  *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Manual Disorders*, 34 (American Psychiatric Association, 4th ed. 2000).

6

On August 16, 2002, Dr. Vore completed a Physical Residual Functioning Capability Assessment (Tr. 273). Dr. Vore concluded that Plaintiff could walk approximately 2-3 city blocks without rest, sit for more than 2 hours, stand for 30 minutes (Tr. 275), lift 20 pounds frequently, and 50 pounds occasionally (Tr. 276). When asked whether Plaintiff was a malingerer, Dr. Vore stated that Plaintiff does not consciously malingerer, but "his stresses, including depression, manifest as bod[il]y symptoms" (Tr. 274). Dr. Vore concluded that Plaintiff could handle a low stress working environment and that his cardiac condition would seldom interfere with his attention or concentration (Tr. 274). Dr. Vore also opined that Plaintiff would likely miss more than four days of work per month (Tr. 283).

Thereafter, on November 4, 2002, Dr. Vore wrote a letter to the Government Assistance Program stating that Plaintiff "is not capable of working at that time and is effectively disabled" (Tr. 287). Furthermore, Dr. Vore indicated that Plaintiff needed assistance paying his utility bills (Tr. 287). Dr. Vore did not include any medical evidence supporting his conclusion (Tr. 287). Dr. Vore also failed to indicate whether he considered Plaintiff disabled as that term is defined in the Social Security Act (Tr. 287).

On September 22, 2003, Plaintiff went to Dr. Vore for a diabetes check-up (Tr. 433). Dr. Vore determined that Plaintiff was not experiencing any problem with his diabetes, but that he was continuing to suffer from depression and sleeplessness (Tr. 433). Plaintiff complained of martial problems and lack of motivation to engage in certain recreational activity, such as playing his guitar (Tr. 433). Dr. Vore informed Plaintiff that his lack of ambition to engage in activity was self-induced (Tr. 433). Dr. Vore noted that Plaintiff continuously felt sorry for himself (Tr. 433). Dr. Vore also emphasized that Plaintiff had been finding it difficult to refrain from consuming alcohol

7

as a way of handling his depression (Tr. 433). Dr. Vore recommended counseling and prescribed a different medication to deal with Plaintiff's sleeplessness (Tr. 433).

Plaintiff had another visit with Dr. Vore on December 17, 2003 (Tr. 430). During his appointment, Plaintiff expressed frustration concerning the government's denial of his claim for social security benefits (Tr. 430). In response to Plaintiff's statement that the judge discounted Dr. Vore's opinion because he was not a specialist, Dr. Vore stated, "I wondered why they wanted my opinion in that case" (Tr. 430). Dr. Vore noted that Plaintiff was very frustrated during the visit and that he "dramatically" talked about his anger (Tr. 430). Dr. Vore concluded, once again, that Plaintiff needed professional help and suggested that Plaintiff suffered from a form of personality disorder, emotional inadequacy, chronic depression, or low frustration tolerance (Tr. 443).

On April 22, 2004, Dr. Vore examined Plaintiff and reported that Plaintiff had a normal blood pressure and pulse (Tr. 443). Dr. Vore found that Plaintiff's cranial nerves and his reflexes in both his upper and lower extremities were grossly intact (Tr. 443). Dr. Vore concluded that although Plaintiff's hip flexors and quads did not seem as strong, he could stand on both legs without support (Tr. 443). In his report, Dr. Vore stated that he felt "strongly that there [was] a significant emotional component" to Plaintiff's difficulties, "including a strong somatization tendency" (Tr. 443). Dr. Vore specifically noted that he "would prefer not to write another disability report without Dr. Patel's opinion and likewise, a repeat evaluation by Neurology" (Tr. 443).

On May 20, 2004, Mei-Chiew Lai, M.D. examined Plaintiff at the request of the State Agency for complaints of constant neck pain (Tr. 455). Plaintiff informed Dr. Lai that he had been experiencing persistent neck pains for three weeks and that this pain did not derive from any accident or injury (Tr. 455). Dr. Lai found Plaintiff to be alert, oriented, and cooperative (Tr. 457). Furthermore, Dr. Lai determined that Plaintiff was in no acute distress and that his speech was

coherent (Tr. 457).  During the examination, Dr. Lai concluded that Plaintiff had a normal heart rate and normal muscle tone (Tr. 457).  Dr. Lai further reported that while there was a generalized weakness of Plaintiff's left upper and lower extremities, there was no corresponding weakness on the right side (Tr. 459).  Dr. Lai noted that the cause of the left-sided weakness was uncertain (Tr. 458).  Dr. Lai concluded that further medical testing would need to be conducted to determine the cause of Plaintiff's left-sided weakness (Tr. 458).  With regard to Plaintiff's depression, Dr. Lai suggested that Plaintiff get an opinion from a psychologist (Tr. 458).

On June 6, 2004, at the request of Dr. Vore, Plaintiff visited Chandu Patel, M.D. (Tr. 451). Like Dr. Lai, Dr. Patel reported Plaintiff to be alert and oriented (Tr. 452).  While Dr. Patel noted that Plaintiff's mood was depressed, he described Plaintiff as well-groomed with good personal hygiene (Tr. 452).  Plaintiff denied current paranoia, hallucinations, or suicidal ideations (Tr. 452). Plaintiff complained of sleeplessness and a general lack of motivation (Tr. 452).  At the very outset of the interview, Plaintiff informed Dr. Patel that had been denied social security benefits and that "he could not understand why his application was denied, as he [was] having multiple medical problems and ha[d] worked…his entire adult life" (Tr. 452).  Dr. Patel diagnosed Plaintiff with Mood Disorder, Secondary to Medical Problems, Dysthymic Disorder; and Alcohol Abuse (Tr. 452). Ultimately, Dr. Patel assigned Plaintiff a GAF score of 55 (Tr. 452).

On June 24, 2004, Bruce J. Goldsmith, Ph.D., a State Agency psychologist, reviewed the evidence of record and concluded that Plaintiff had a mild degree of restriction in the functional areas of "Restriction of Activities of Daily Living"; "Difficulties in Maintaining Social Functioning"; and "Difficulties in Maintaining Concentration, Persistence, or Pace" (Tr. 489).  Dr. Goldsmith also opined that Plaintiff had not experienced any repeated episodes of decompensation for an extended duration (Tr. 489).

Dr. Vore examined Plaintiff on July 6, 2004 and reported on various aspects of Plaintiff's physical condition (Tr. 445). Dr. Vore found Plaintiff's reflexes and sensation normal (Tr. 445). Plaintiff's grip and strength were "okay" (Tr. 445). Dr. Vore noted that Plaintiff had difficulty turning his neck to the left, but recognized that the muscle itself was perfectly strong (Tr. 445). When asked by Plaintiff where his medical problems originated, Dr. Vore stated that "function depends not only on ability but enthusiasm and determination to succeed" (Tr. 445). Dr. Vore went on to state that "[t]he judge…apparently is blind and has no sympathy for people who don't have as much motivation to work as he does" (Tr. 445). Dr. Vore also commented on the possibility of malingering (Tr. 445). Specifically, Dr Vore stated that "[i]t's possible that he was malingering...I don't think that he consciously malingers although he certainly feels sorry for himself" (Tr. 445). Dr. Vore also expressed his opinion that Plaintiff was disabled, but did not provide any objective medical evidence to support this conclusion (Tr. 445). Furthermore, Dr. Vore did not indicate that he believed Plaintiff to be disabled as that term is defined in the Social Security Act (Tr. 445).

On July 15, 2004, at the request of the State Agency, Joseph Konieczny, Ph.D. conducted a psychological evaluation of Plaintiff (Tr. 434). Dr. Konieczny noted that Plaintiff appeared "clean and combed" and that his grooming and hygiene appeared adequate (Tr. 435). Furthermore, Dr. Konieczny reported that, despite Plaintiff's obvious depression, he was pleasant and cooperative and responded to all questions and tasks posed to him (Tr. 436). The doctor also concluded that Plaintiff was capable of expressing himself in a clear and coherent manner (Tr. 436). Dr. Konieczny opined that Plaintiff showed a moderate degree of deficit in his awareness of rules of social judgment and conformity, but that his ability to concentrate and to attend to tasks appeared to be adequate (Tr. 436). Dr. Konieczny also concluded that Plaintiff was functioning at a reduced level of efficiency (Tr. 436). Dr. Konieczny further reported that Plaintiff's ability to follow directions showed

10

indication of mild impairment and that his ability to withstand stress and pressure showed indication of moderate to severe impairments and would appear to reflect his depression (Tr. 439). Dr. Konieczny diagnosed Plaintiff with major depressive disorder, vascular dementia and assigned Plaintiff a GAF score of 44.[3] Dr. Konieczny also completed a Medical Source Statement (Tr. 441). When asked what medical or clinical findings supported his assessment, Dr. Konieczny stated a "history of chronic major depression as well history of vascular dementia" (Tr. 441).

On July 26, 2004, Arthur L. Sagone Jr. M.D., I.M., a State Agency physician, reviewed the evidence of record (Tr. 497) and concluded that Plaintiff could lift 50 pounds occasionally and 20 pounds frequently (Tr. 494). Dr. Sagone further opined that Plaintiff could stand or walk 30 minutes at a time four times during an eight hour day and sit for six hours in an eight hour day (Tr. 494). Dr. Sagone also found Plaintiff's ability to push or pull with his extremities unlimited (Tr. 494).

On August 13, 2004, Plaintiff visited Dr. Vore to follow-up on his left costal margin pain (Tr. 447). Dr. Vore, however, recognized that "[w]hat he really wanted to complain about was that he was turned down for disability again" and "cannot understand why" (Tr. 447). Dr. Vore admitted that he did not understand Plaintiff's disability and that he "s[aw] the government's position" (Tr. 447). While Dr. Vore again concluded that Plaintiff suffered a disability, he reported that he was "not sure that [plaintiff] d[id] the most that he c[ould]" with the function that he had (Tr. 447). As with previous reports, Dr. Vore did not provide any objective medical evidence that Plaintiff

---

[3] A GAF score in the range of 41 to 50 is indicative of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Manual Disorders*, 34 (American Psychiatric Association, 4th ed. 2000).

suffered from a disability, nor did he indicate that Plaintiff suffered from a disability as that term is defined in the Social Security Act (Tr. 447).

On November 3, 2004, Jeffery Madden, Ph.D., testified as a medical expert at Plaintiff's Social Security Hearing (Tr. 24). Dr. Madden opined that Plaintiff's test scores assessed by Dr. Konieczny were not consistent with his abilities (Tr. 577-78). Dr. Madden further testified that the Plaintiff's medical evaluations did not correlate with his alleged degree of impairment (Tr. 585). Dr. Madden did, however, admit that Plaintiff could have a conversion disorder based on his symptoms, but that the record did not indicate a positive diagnosis of this disorder (Tr. 585). Finally, Dr. Madden testified that the GAF score of 44 which Dr. Konieczny assigned Plaintiff was not reliable because, it was based upon test scores that were flawed due to a lack of effort by Plaintiff (Tr. 586).

On December 12, 2004, MedCentral Health System in Mansfield, Ohio admitted Plaintiff for suicidal ideations (Tr. 383). Dr. Chandravan Patel, M.D. treated Plaintiff during his stay at MedCentral (Tr. 383). Plaintiff informed Dr. Patel that he remained sober for approximately three years, but had a relapse a week prior where he drank a 12-pack of beer daily (Tr. 385). Dr. Patel determined that Plaintiff had a history of severe depression (Tr. 383). The doctor noted that Plaintiff expressed aggravation with the government for denying his application for social security benefits (Tr. 383). In his discharge diagnoses, Dr. Patel stated that three to four days subsequent to admission, Plaintiff remained depressed and had subjective somatic complaints without any positive findings (Tr. 381). Dr. Patel noted, however, that Plaintiff's mood began to improve as his stay

progressed and that his suicidal ideations began to decrease (Tr. 381).  Upon discharging Plaintiff, Dr. Patel diagnosed Plaintiff with major depression and assigned him a GAF score of 65. [4]

On January 25, 2005, James F. Sunbury, Ph.D., evaluated Plaintiff at the request of the State Agency (Tr. 500).  Per Dr. Sunbury's report, Plaintiff walked with the assistance of two Canadian crutches and was neatly groomed and very cooperative (Tr. 500).  Plaintiff had the ability to concentrate on the doctor's questions, maintain a train of thought in developing answers, and form relevant and coherent answers (Tr. 500).  Plaintiff reported that he had a good relationship with his neighbors, but that he "snap[ed] at his wife" (Tr. 500).  Dr. Sunbury opined that Plaintiff's ability to relate to others, including fellow workers and supervisors, would probably be mildly limited due to depression and personality traits (Tr. 502).  Dr. Sunbury also found that Plaintiff's ability to withstand the stress and pressures associated with day to day work activity were moderately limited due to depression, and likely somatization and personality traits (Tr. 502).  Furthermore, Dr. Sunbury concluded that Plaintiff's ability to maintain attention to perform simple repetitive tasks was mildly limited, but that his ability to understand and follow instructions was not limited (Tr. 502).  Dr. Sunbury diagnosed Plaintiff with Major Depressive Disorder and Alcohol Dependence and assigned him a GAF score of 50 (Tr. 501).

On December 21, 2005, Dr. Madden testified at a Video Teleconference Hearing (Tr. 25). Dr. Madden opined that Plaintiff had major depressive disorder and possibly a somatoform disorder (Tr. 25).  With regard to the somatoform disorder, Dr. Madden stated that the record did not fully support this diagnosis (Tr. 25).  Dr. Madden again noted that Plaintiff's various test results were

---

[4] A GAF scale of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Manual Disorders*, 34 (American Psychiatric Association, 4th ed. 2000).

13

flawed by Plaintiff's lack of effort (Tr.25).  Dr. Madden concluded that Plaintiff's impairments did not meet or equal any section of the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4 (Tr. 25)

## II.    DISCUSSION

### A.    Legal Standard

In cases that are referred to a magistrate judge for preparation of a R&R, the Federal Magistrate Act requires that a district court conduct a *de novo* review only of those portions of a R&R to which the parties have made an objection. 28 U.S.C § 636(b)(1)(C).  The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action, however, is not *de novo*.  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id*.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence

14

on the record. *See Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. The Sixth Circuit instructs that, "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a *zone of choice* within which the decision maker can go either way without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### B.     Analysis

Under 42 U.S.C. § 423(d)(2), an individual is disabled if his or her physical or mental impairments are of such severity that he or she is unable to engage in "substantial gainful activity." In making a determination as to "disability," an ALJ is required to follow a five-step sequential analysis set out in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The Sixth Circuit has summarized the five steps as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

15

> 5. Even if claimant's impairment does prevent him from doing his past
> relevant work, if other work exists in the national economy that
> accommodates his residual functional capacity and vocational factors (age,
> education, skills, etc.), he is not disabled.

*Walter v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  During the first four steps of the

sequential analysis, the claimant has the burden of proof.  *Id*.  At the fifth step, the burden shifts to

the Commissioner.  *Id*.

Here, the ALJ ultimately concluded that Plaintiff was not "disabled" as that term is defined

in the Social Security Act.  At step two, the ALJ found that the relevant medical evidence

established that Plaintiff had "severe impairments," namely – depression, a history of alcohol abuse,

and conversion disorder (Tr. 37).  The ALJ concluded, however, at step three, that the Plaintiff's

impairments did not meet or equal a  listed impairment from the Listing of Impairments of Appendix

1 (Tr. 37).  At step four, the ALJ determined that Plaintiff *did not* retain the residual functional

capacity to perform past relevant work.  Finally, at step five, the ALJ found that Plaintiff *did* retain

the residual functional capacity to make an adjustment to other work which existed in significant

numbers in the national economy (Tr. 37).

 On appeal, the Plaintiff asserts two errors.  First, the Plaintiff asserts a general claim that

the ALJ erred in "failing to analyze properly the evidence of [his] somatoform disorder."[5]  In

particular, Plaintiff contends that the ALJ erroneously interpreted what Plaintiff says is evidence of

---

[5]  The common feature of a Somatoform Disorder is the presence of physical symptoms
that suggest a general medical condition and are not fully explained by a general medical
condition, by the direct effects of a substance, or by another mental disorder.  The symptoms
must cause clinically significant distress or impairment in social, occupational, or other area of
functioning.  In contrast to Factitious Disorders and Malingering, the physical symptoms are not
intentional.  American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*
445 (4th ed. rev. text 1997).  A Conversion disorder is a specific type of Somatoform Disorder
that "involves unexplained symptoms or deficits affecting voluntary motor or sensory function
that suggest a neurological or other general medical condition."  *Id*. at 445, 452-57.

16

a somatoform disorder to be evidence of malingering only. Plaintiff contends that this misinterpretation caused the ALJ to discount his symptoms on credibility grounds and resulted in the ALJ finding a less limiting residual functional capacity than was actually the case.  In other words, Plaintiff argues that the ALJ's decision to reject his testimony concerning his physical limitations was not supported by substantial evidence because the evidence used to discredit his testimony was, instead, demonstrable of the existence of a somatoform disorder.  Second, Plaintiff argues that the ALJ erred in rejecting the opinion of his treating physician, Dr. Vore.

As will be explained in more detail below, the Court disagrees with both of Plaintiff's arguments and concludes that the ALJ applied the correct legal standards and that substantial evidence supported the ALJ's decision.

    1.  **The Administrative Law Judge's Analysis of Somatoform Disorder**

        **a. The ALJ did not err in his analysis at the third step of the sequential evaluation process in concluding that Plaintiff's impairments did not meet or equal a listed impairment from the Listing of Impairments of Appendix 1.**

It is unclear whether Plaintiff objects to the ALJ's conclusion at step three that his impairments did not meet or equal a listed impairment.  The Magistrate Judge addressed this issue in his R&R, however, presumably because Plaintiff's objections to the ALJ's decision were so general in nature.  The Court also has considered this matter and ultimately agrees with the Magistrate Judge's conclusion that Plaintiff's impairments do not meet or equal a listed impairment from the Listings of Impairments of Appendix 1.  In particular, the Court concurs with the Magistrate Judge's finding that Plaintiff failed to demonstrate that he has marked restrictions in two of the four functional areas as required by listings §12.04 and §12.07, governing affective/somatoform disorders.

In order to determine whether a mental impairment meets or equals a listing of impairments at step three, the ALJ must consider the degree of functional limitation in accordance with the prescribed psychiatric review technique ("PRT"). A proper assessment includes rating the applicant in four broad functional areas, including activities of daily living, social functioning, concentration, persistence and pace, and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); § 416.920a(c)(3). An applicant is given a rating on a five-point scale for the first three functional areas. *Id.* at § 404.1520a(c)(4); § 416.920a(c)(4). The scale ranges from "none," to "mild," "moderate," "marked," and, ultimately, to "extreme." *Id.* With regard to decompensation, the applicant is rated on a four-point scale of "none," "one or two," or "three, four or more." *Id.* According to listing § 12.04 governing affective disorders, such as depression and somatoform disorder, the applicant must have either (1) a "marked" restriction in at least two of the four categories or (2) *repeated* episodes of decompensation of *extended* duration. 20 C.F.R. Pt. 404, Subpt. P, App 1; §12.04(B); §12.07(B).

In this case, as noted, the ALJ determined at step two that Plaintiff was not engaged in substantial gainful activity and that his impairments did constitute "severe medical impairments" (Tr. 316). At step three, the ALJ found, however, that Plaintiff's impairments did not meet or equal a listed impairment from the Listing of Impairments of Appendix 1. In making this determination, the ALJ determined that Plaintiff had less than "marked" restrictions in the first three areas, a finding to which Plaintiff has not objected. Plaintiff contends, however, that the ALJ erred in determining that he had not experienced repeated episodes of decompensation. In support of his position, Plaintiff relies on the testimony of Dr. Madden who indicated that Plaintiff had, in fact, experienced three episodes of decompensation. Plaintiff fails to take into account, however, the undisputed fact that he received ratings of less than "marked" restrictions in the first three functional

18

areas.  Thus, even if he could show that he had suffered three episodes of decompensation, Plaintiff cannot demonstrate that he has a "marked" restriction in two of the four categories and, thus, cannot meet the step three requirements unless he can establish that his episodes of decompensation were all "of an extended duration."  Dr. Madden's testimony simply did not establish that additional fact, however, and Plaintiff points to nothing else in the record that does so.  When asked whether Plaintiff experienced episodes of decompensation, Dr. Madden initially expressed uncertainty as to whether all of Plaintiff's hospitalizations even would qualify as episodes of decompensation. Specifically, Dr. Madden testified that he was "not sure all hospitalizations would qualify for episodes of decompensation" and that he could not be sure, but he "would assume…there were three episodes of decompensation" (Tr. 603).  While Dr. Madden testified that Plaintiff potentially experienced three episodes of decompensation, he did not suggest that these episodes lasted for an extended duration so as to bring the Plaintiff within the Listing.  It was Plaintiff's burden to establish this face, but nothing in the record does so.  Consequently, the ALJ's determination that Plaintiff's impairments did not meet or medically equal an impairment listed in Appendix 1 of Subpart P, Regulation No. 4 was supported by substantial evidence.

### b. The ALJ did not err in his analysis at the fifth step of the sequential evaluation process in assessing Plaintiff's residual functional capacity.

As noted, Plaintiff primarily contends that the ALJ erroneously interpreted evidence which Plaintiff says is indicative of conversion disorder as evidence of malingering only.  Stated differently, the Plaintiff argues that the ALJ's decision to discredit his testimony concerning his physical limitations was not supported by substantial evidence because the factors used to discredit his testimony actually were factors establishing the existence of somatoform disorder.  Simply put, Plaintiff argues that, if somatoform disorder is a physical manifestation of emotional trauma with

19

no obvious physical cause, then a rejection of his complaints about his physical ailments on grounds that there is no objective evidence to support those claims is effectively a rejection of the somatoform diagnosis – or at least represents a fundamental misunderstanding of it.  As discussed above, the Court does not agree that the mere presence of a somatoform diagnosis prohibits the ALJ from making credibility determinations regarding a claimant's complaints of pain or functional limitations as long as that determination takes the disorder into account.  The Court concludes the record sufficiently supports the ALJ's conclusion even if one assumes that the Plaintiff is affected with somatoform disorder.  Plaintiff further argues that because the ALJ erroneously rejected his testimony concerning his physical limitations, the ALJ's assessment of his residual functional capacity could not be supported by substantial evidence.  The Court finds that, while a portion of the evidence used to discredit Plaintiff's testimony concerning his physical limitations could support the existence of a somatoform disorder, the weight given Plaintiff's testimony was based on a sufficient number of other factors that were *not* indicative of a somatoform disorder that the ALJ's decision to discredit Plaintiff's testimony, and his ultimate determination of Plaintiff's residual functional capacity, still find adequate support in the record.

In discrediting Plaintiff's testimony, the ALJ relied on various factors, including Plaintiff's inconsistent testimony, the inconsistency between Plaintiff's testimony and the record, and the lack of objective medical evidence to support his complaints (Tr. 33-36).  The Magistrate Judge agreed with the ALJ's decision to discredit Plaintiff's testimony, noting in particular that Plaintiff's activity level was inconsistent with his alleged physical limitations.  The Magistrate Judge also emphasized that Plaintiff not only provided inconsistent testimony, but also rendered inconsistent versions of his symptoms to examiners.

While there are refined and complex psychological concepts and distinctions, upon a thorough review of the ALJ's decision and the record, the Court concludes that the ALJ was within his "zone of choice" when he discredited Plaintiff's testimony and determined Plaintiff's residual functional capacity. *See Mullen*, 800 F.2d at 545. The Court's conclusion is based in part on the fact that the Sixth Circuit has held previously that an ALJ's decision discrediting a social security plaintiff's testimony on the basis of factors similar to those used by the ALJ in this case was supported by substantial evidence. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542-43 (6th Cir. 2007). Second, the Court finds further support for the ALJ's decision to discredit Plaintiff's testimony in the fact that no medical source of record actually ever diagnosed Plaintiff with a conversion or somatoform disorder.

First, in *Cruse*, the Sixth Circuit upheld an ALJ's decision discrediting the testimony of a social security plaintiff diagnosed with conversion disorder based on inconsistent testimony and the lack of objective medical support in the record. *Id.* In that case, the plaintiff applied for disability benefits alleging that she could not walk unaided, fell two to three times per day, and suffered migraines approximately two to three times per week. *Id.* at 537. Plaintiff also testified that she had severe concentration issues and could not manage her personal finances. *Id.* Finally, plaintiff claimed that she was incapable of bathing herself or driving. *Id.* at 538. The majority of the medical opinions contained in the record supported a finding of conversion disorder. *Id.* at 535-37. The ALJ accepted the diagnosis of conversion disorder, but denied plaintiff disability benefits because he found her capable of performing past relevant work. *Id.* at 538. The ALJ specifically rejected plaintiff's testimony concerning her limitations because it was "not supported by medical evidence and was less than fully credible." *Id.* Plaintiff contended that the ALJ erred in failing to accept her testimony in assessing her residual functional capacity because doing so was inconsistent with her

21

diagnosis of conversion disorder.  *Id.* at 534.  The Sixth Circuit rejected plaintiff's argument and held that substantial evidence supported the ALJ's decision to discredit her testimony.  *Id.*  In particular, the Sixth Circuit noted that the ALJ found plaintiff's subjective complaints inconsistent with the objective medical evidence, as well as her own testimony.  *Id.* at 542-43.

Here, it is apparent that the factors used to discredit Plaintiff's testimony are substantially similar to the discrediting factors relied upon by the ALJ and upheld by the Sixth Circuit in *Cruse*. Like the ALJ in *Cruse*, the ALJ here considered the fact that there was a  lack of objective medical evidence to support the alleged severity of Plaintiff's physical limitations (Tr. 33).  *See id.* Furthermore, both the ALJ in *Cruse* and the ALJ in this case relied on the plaintiffs' own inconsistent statements regarding their activities and limitations (Tr. 34).  *Id.*  For example, the ALJ in this case noted that claimant "has at times alleged difficultly reading" and "at other times…has reported that he is able to read adequately" (Tr. 34).  *Id.*  In addition, like the ALJ in *Cruse*, the ALJ here found the plaintiff's testimony in conflict with other evidence in the record (Tr. 34).  *Id.*  In particular, the ALJ in this case noted that Plaintiff's good relationship with his wife, sister, brother, and mother contradicted Plaintiff's testimony concerning his "chronic problems with irritability and difficulty being around people" (Tr. 34).  Furthermore, just as the ALJ in *Cruse* found plaintiff's testimony regarding her activity to be inconsistent with her alleged physical limitations, the ALJ in this case determined Plaintiff's statement to Dr. Vore – that he had been playing catch football with his grandson and was able to stumble trying to catch himself – contradicted his testimony regarding his physical limitations.  The Sixth Circuit in *Cruse* found that substantial evidence supported the ALJ's decision to discredit the plaintiff's testimony on the basis of factors analogous to those used by the ALJ in  this case to discredit Plaintiff's testimony.  Even beyond those factors cited in *Cruse*, moreover, the ALJ here felt that evidence that the Plaintiff apparently had manipulated his IQ test

22

results, did not seek out or comply with suggested psychological treatments, repeatedly stated to his doctors that his inability to obtain disability benefits was a substantial factor in his mood deficits, and the fact that Plaintiff's activities of daily living were not *materially* affected by his alleged disabilities, all undercut Plaintiff's credibility and, thus, the credibility of his own characterization of his functional limitations. Accordingly, the Court finds that substantial evidence supported the ALJ's decision to discredit Plaintiff's testimony.

It is important to note, moreover, that, while the ALJ found Plaintiff to have severe impairments, including conversion disorder, for purposes of step two of the sequential evaluation process, no medical source of record actually has diagnosed Plaintiff with conversion disorder. *See Higgs v. Bowen*, 880 F.2d 860, 862 (6th 1988) (holding that the step two severity regulation has been construed as a *de minimis* hurdle in the disability determination process). As the Commissioner points out, no mental health specialist diagnosed Plaintiff with a somatoform disorder. For example, Dr. Chandu Patel diagnosed Mood Disorder, Secondary to Medical Problems; Dysthymic Disorder; and Alcohol Abuse (Tr. 452); Dr. Ickes diagnosed Major Depressive Disorder (Tr. 229); Dr. Chandravan Patel diagnosed Major Depression (Tr. 381); Dr. Konieczny diagnosed Major Depressive Disorder, Vascular Dementia, and Depressive Disorder affecting general medical condition (Tr. 439); and Dr. Sunbury diagnosed Major Depressive Disorder and Alcohol Dependence (Tr. 501). Further, Drs. Marlaw, Lewin, and Goldsmith, all State Agency psychologists, diagnosed Plaintiff with an Affective Disorder (Tr. 240, 246, 479). The fact that Plaintiff has not been diagnosed with conversion disorder by any medical examiner of record further supports the ALJ's decision to reject his allegedly somatic subjective complaints at steps three through five, despite finding Plaintiff's conversion disorder to be a severe impairment at step two. *See Griffeth v. Comm'n of Soc. Sec.*, 217 Fed. Appx. 425, 428 (6th 2007) (holding that an ALJ's

determination that a social security plaintiff's impairments are severe for purposes of step two is not inconsistent with his finding that the limitation has "little effect" on the claimant's ability to perform basic work-related activities at steps three through five).

In sum, in assessing Plaintiff's residual functional capacity, the ALJ correctly considered all medical opinions presented in the record, as well as Plaintiff's testimony (Tr. 313-314).  Ultimately, the ALJ relied upon objective medical evidence and the other evidence included in the record to reasonably determine that Plaintiff retained the residual functional capacity to:

> lift/carry 50 pounds occasionally and 20 pounds frequently; stand/walk 30 minutes at a time up to 4 hours each in an 8 hour period; and perform unskilled work.

Consequently, the Court finds that substantial evidence supported the ALJ's assessment of Plaintiff's residual functional capacity and his step five conclusions.

### 2.  The Administrative Law Judge's Rejection of the Opinion from the Treating Physician

Plaintiff further claims that the ALJ erred in rejecting the opinion of his treating physician, Dr. Vore.  The ALJ rejected portions of Dr. Vore's opinion as inconsistent with the totality of the objective medical evidence of record, based on subjective complaints from the patient, and as outside the doctor's area of expertise (Tr.30).  The Court first finds that, while the ALJ did not give Dr. Vore's opinion controlling weight, he did not completely disregard Dr. Vore's opinion as Plaintiff contends.  The Court further finds that, to the extent the ALJ did reject Dr. Vore's opinion, he complied with 20 C.F.R. § 404.1527(d)(2) in doing so.  Finally, the Court finds that any violation of § 1527(d)(2) by the ALJ was merely *de minimis* and does not require reversal.

An ALJ is required to give the opinion of a treating physician controlling weight in cases where the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the case record." *Wilson*

24

*v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). In cases where the opinion of a treating physician is not granted controlling weight, the ALJ must apply certain factors to determine the appropriate weight to give the opinion. *Bowen v. Comm'n Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007). In particular, the ALJ must consider: "(1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, and (5) the specialization of the treating source." § 1527(d)(2). In most instances, the failure to comply with §1527(d)(2) will result in the case being reversed and remanded. *See Wilson*, 378 F.3d at 550; *Bowen v. Comm'n Soc. Sec.*, 478 F.3d 742, 750 (6th Cir. 2007); *Hall v. Comm'n of Soc. Sec.*, 148 F. App'x 456, 457 (6th Cir. 2005). The fact that substantial evidence supported an ALJ's decision to discount the treating physician's opinion does not affect this outcome. *Wilson*, 378 F.3d at 546. There are, however, certain instances where a violation of § 1527(d)(2) is merely *de minimis* and does not necessiate such a result. *Id.* at 547. In *Wilson*, the court outlined three circumstances in which a failure to comply with §1527(d) "may not warrant reversal":

(1) if a treating source's opinion is so *patently deficient* that the Commissioner could not possibly credit it; (2) if the Commissioner *adopts the opinion of the treating source* or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of §1527(d)(2)--*the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation*."

It should be noted at the outset that, while the ALJ did not accord Dr. Vore's opinion controlling weight, he did not completely reject his opinion as Plaintiff contends. In his opinion dated December 2, 2003, the ALJ documented each appointment that Plaintiff had with Dr. Vore (Tr. 307-311). Furthermore, the ALJ took Dr. Vore's opinion into account when assessing Plaintiff's residual functional capacity (Tr. 313). The ALJ expressly stated that "[t]his residual functional capacity is consistent with the opinions of Dr. Vore, the claimant's treating physician [,]

25

as well as the opinion of State Agency psychologists and Dr. Ickes, the consulting psychologist" (Tr. 313). While the ALJ did reject Dr. Vore's opinion that Plaintiff was "not very employable," he relied on 20 C.F.R. § 404.1527(e)[6] and § 416.927(e) in doing so (Tr. 313). Upon remand, the ALJ again took Dr. Vore's opinion into account in re-evaluating Plaintiff's residual functional capacity (Tr. 29). As in his prior opinion, the ALJ emphasized that his determination of Plaintiff's residual functional capacity took into account "all medical opinions, which are statements from acceptable medical sources, *including treating sources*, which reflect judgments about the nature and severity of the impairments and resulting limitations..." (Tr. 29) (emphasis added). The ALJ relied on §1527(e) in rejecting Dr. Vore's statement that claimant was disabled and his statement concerning Plaintiff's residual functional capacity (Tr. 30). Finally, while the ALJ stated that "Dr. Vore's opinion is rejected...," it is clear from examining the entire record that the ALJ did accord weight to the majority of Dr. Vore's medical opinions (Tr. 30).

Furthermore, to the extent that the ALJ did reject Dr. Vore's opinion, he complied with §1527(d)(2). The ALJ took account of the length of the treating relationship between Plaintiff and Dr. Vore by outlining each of Plaintiff's appointments with Dr. Vore from November 15, 2000 to August 17, 2005 and considering the medical evaluations resulting from those appointments (Tr. 309-317, 20-31). Likewise, the ALJ took the nature and extent of the treatment relationship into account when he described the reason for each appointment, the medical testing completed, and the results of those examinations (Tr. 309-317, 20-31). Further, the ALJ concluded that Dr. Vore's opinion was inconsistent with the totality of the objective medical evidence of record (Tr. 30). Specifically, the ALJ found that Dr. Vore's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with the evidence of record (Tr.

---

[6] §1527(e)(1) provides that certain medical opinions are reserved to the Commissioner, such as opinions that the claimant is "disabled" or "unable to work."

26

30-31).  Finally, in rejecting portions of Dr. Vore's opinion, the ALJ relied heavily on the doctor's lack of expertise with regard to mental impairments.  The ALJ emphasized that Dr. Vore was a general practitioner and lacked expertise.  As indicated in 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5), the opinion of a specialist is accorded more weight than that of a general practitioner. The ALJ's reliance upon Dr. Vore's lack of expertise is particularly important in light of Dr. Vore's own statements that he "wondered why they wanted my opinion in that case" and that he "would prefer not to write another disability report without Dr. Patel's opinion and likewise, a repeat evaluation by Neurology" (Tr. 430).  These statements indicate that even Dr. Vore himself had reservations about the weight of his opinion on complex psychological issues.  As such, the ALJ took into account the proper factors when considering the weight to give Plaintiff's treating physician's opinion.  Accordingly, the ALJ complied with §1527(d)(2) to the extent that he rejected Dr. Vore's opinion.

Finally, the Court finds that even if one could say that the ALJ violated §1527(d)(2) in his analysis of Dr. Vore's opinions, that violation was *de minimis* and does not require reversal. Specifically, the Court concludes that, though the ALJ may not have explained fully the weight given to Dr. Vore's opinion, he still satisfied the goals of §1527(d)(2).  According to §1527(d)(2), the ALJ must provide good reason in the notice of determination or decision for the weight given to the claimant's treating source's opinion.  *Wilson*, 378 F.3d at 544.  As the *Wilson* Court recognized, "[t]he requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Id*.  The United States Court of Appeals for the Sixth Circuit has held that an indirect attack on the treating

27

source's opinions and the consistency of those opinions with the rest of the record evidence satisfies the goals of §1527(d)(2). *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470 (6th Cir. 2006).

In *Nelson*, the claimant filed for disability benefits in 2001 alleging that various mental impairments rendered him disabled. *Nelson*, 195 Fed. Appx. at 463.  Ultimately, the ALJ concluded that the claimant was not disabled, because he retained the residual functional capacity to perform past relevant work. *Id.* at 467.  The Court found that the ALJ based his determination on the overall lack of objective findings, as well as the medical opinions of the various physicians. *Id.*  The ALJ, however, failed to specify the weight given to the opinions of claimant's treating physicians. *Id.* The claimant alleged that the ALJ's lack of explicit explanation regarding the weight given to the opinions of his treating sources violated §1527(d)(2). *Id.* at 468.

While the Court in *Nelson* recognized that the ALJ only briefly mentioned the opinions of claimant's treating physicians and did not indicate the weight given their opinions, the Court determined that the discussion of other record evidence about claimant's mental impairments indirectly discredited the opinions of the treating sources. *Id.* at 470-71.   In particular, the Court noted that the ALJ accorded weight to many other medical opinions that found  claimant's limitations to be far less severe than the limitations indicated by claimant's treating physicians. *Id.* at 471.  Finally, the Court noted that the ALJ's determination – that "there [were] no clinical and diagnostic findings to establish [that Nelson] has conditions that would significantly compromise his RFC" – constituted an indirect attack on the opinions of claimant's treating physicians. *Id.*

Just as the ALJ in *Nelson* indirectly attacked the credibility of claimant's treating physicians' opinions through discussion of contradictory medical opinions, the ALJ in the instant case articulated medical opinions which directly rebutted Dr. Vore's assessment of Plaintiff's condition. The ALJ considered Dr. Ickes' opinion that Plaintiff's overall intellectual functioning was estimated

28

within the average classification (Tr. 310).  The ALJ also found credible the GAF score of 55 assessed by Dr. Patel (Tr. 22) and the GAF score of 55 assessed by Dr. Sunbury (Tr. 25).  These evaluations of Plaintiff's condition are in stark contrast to Dr. Vore's conclusory assessment that Plaintiff "is not employable" and is "disabled."  Finally, like the ALJ in *Nelson*, the ALJ in this case emphasized the lack of objective medical findings supporting Plaintiff's alleged disability (Tr. 30). Therefore, under *Nelson*, any violation of §1527(d)(2) by the ALJ here was *de minimis*, and does not require reversal because the ALJ's discussion of other record evidence concerning plaintiff's condition met the goals of the statutory provision.

As emphasized in the R&R, this Court agrees that the ALJ's conclusion that Plaintiff pressured Dr. Vore into opining that he was disabled was not supported by substantial evidence. While it is true that a patient can be "quite insistent and demanding in seeking supportive notes or reports from their physician," there is no evidence that Plaintiff engaged in such coercion.  Despite the ALJ's unsupported conjecturing on this point, however, the Court finds that the ALJ  ultimately relied on legitimate factors of consistency, supportability, and specialization to exclude Dr. Vore's opinion.  Accordingly, this Court finds that the ALJ did not err in rejecting a portion of  Dr. Vore's opinions.

**III.   CONCLUSION**

For the foregoing reasons, this Court agrees with the Magistrate Judge's conclusion that the ALJ's decision was supported by substantial evidence.  The Court therefore **ADOPTS** the Magistrate Judge's R&R affirming the finding of the ALJ.  This case is **DISMISSED**.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 23, 2008**